UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MICHAEL FILOZOF,

Plaintiff,

DECISION AND ORDER

04-CV-6545L

v.

MONROE COMMUNITY COLLEGE,
THE COUNTY OF MONROE,
R. THOMAS FLYNN,
JANET J. GLOCKER,
SUSAN SALVADOR,
DAVID DAY,
DIANA RAYNER,
MONROE COMMUNITY COLLEGE BOARD OF TRUSTEES,
CHET ROGALSKI,
SUSAN BELAIR,

Defendants.

---

On November 1, 2004, plaintiff Michael Filozof ("Filozof") commenced the instant action against Monroe Community College, its Board of Trustees and several of its officers and employees, and the County of Monroe (collectively "MCC"). Filozof, who was employed by MCC during the 2002-2003 school year as a political science instructor, alleges that MCC denied him tenure on the basis of his Caucasian race, male gender, and conservative political beliefs, in violation of 42 U.S.C. §1983, 42 U.S.C. §1985, the First Amendment to the United States Constitution, U.S. CONST.

Amend. I, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law §290 et seq. ("NYHRL").

MCC now moves for summary judgment dismissing Filozof's claims pursuant to Fed. R. Civ. Proc. 56 (Dkt. #50), and plaintiff moves for declaratory and injunctive relief barring MCC from continuing certain faculty diversity initiatives (Dkt. #67). For the following reasons, defendant's motion is granted, in part. Plaintiff's motion is denied.

**FACTS**

Filozof was initially hired by MCC as an adjunct political science teacher during the spring 2002 semester. Thereafter, MCC hired him as a full-time, tenure-track political science instructor for the 2002-2003 school year under a one-year term contract.

Tenure-track faculty are evaluated on an annual basis and considered for renewal of the one-year contract. After five years of consecutive one-year contracts, faculty are granted tenure, which is considered a continuous, lifetime appointment. MCC's faculty contract for the 2003 school year ("Faculty Contract") provided that in evaluating faculty members for contract renewal, six specific performance categories "shall be considered": (1) effectiveness in teaching; (2) effectiveness in position; (3) professional activity and growth; (4) service to students; (5) service to department/program/division/college; and (6) service to community.

Filozof was employed in MCC's Anthropology, History, Political Science and Sociology Department ("APHS"). On March 31, 2003, Filozof requested transparencies from the APHS Secretary, Diana Rayner ("Rayner") "in a Shakespearian manner," and bowed and kissed Rayner's

hand. As he left the office, he made a comment to male professor David Day ("Day"), who was standing in the office, to the effect of, "See Dave, that's the way you have to treat them." Rayner thereafter related the incident to APHS Department Chair Susan Belair ("Belair"). Belair attempted to arrange a meeting to discuss the matter but Filozof declined to attend.

Belair then shared the issue with Susan Baker ("Baker"), MCC's Sexual Harassment Officer, who met with both Rayner and Day. Filozof was also asked to meet with Baker. He declined to speak with Baker, but provided Baker with his version of the events in writing. At her deposition, Rayner testified that she had not viewed Filozof's conduct as sexually harassing and had initially resisted Belair's direction that she make a formal sexual harassment complaint against Filozof, but ultimately gave in to pressure from Belair and/or Baker to do so.

Following Baker's investigation, Susan Salvador ("Salvador"), Vice President of Academic services, wrote a memorandum to Filozof requiring that he apologize to Rayner, Day, Baker and Belair, as well as meet with MCC Vice President Glocker to address the issue of his apparent lack of respect for Department Chair Belair. At the meeting with Vice President Glocker, Glocker asked Filozof to engage in a series of meetings with Chairperson Belair for the purpose of addressing his respect for her, and to discuss his "acculturation" at MCC.

On May 16, 2003, after Filozof had twice met with Belair, Vice President Glocker e-mailed Filozof, stating that she was "very serious" about his "interpersonal skills," and emphasizing that success at MCC was dependent not only on effective teaching, but upon being an effective college citizen, and functioning well with colleagues.

In the fall of 2003, MCC began the renewal decision process with respect to Filozof and other professors with term contracts. Typically, the process involves a recommendation by the relevant department or cluster, after which the department chair may make a separate recommendation before the decision passes to the dean, vice president, president and finally, the Board of Trustees. Ordinarily, the dispositive decision is that of the dean, whose recommendation is usually summarily adopted by the vice president, president and the Board.

On October 17, 2003, the History-Political Science Discipline cluster recommended renewal of Filozof's contract for a second year. In support of its recommendation, the cluster submitted more than three hundred pages of documents, including firsthand observations lauding Filozof as "an exceedingly gifted teacher who knows what it takes to get the students to a higher level of understanding," and an Annual Faculty Activity Report documenting a host of department and collegial activities in which Filozof had participated. Students also submitted unsolicited letters praising Filozof's inspirational and skillful pedagogy.

In spite of this recommendation, on November 11, 2003, APHS Chairperson Belair recommended against the renewal of Filozof's contract, citing interpersonal difficulties and alleging that Filozof had failed to adequately participate in college activities beyond teaching. Liberal Arts Dean Chet Rogalski also recommended against renewal. He identified the reasons for his recommendation as Filozof's failure to have "an open mind," initially with regard to the "tremendous opportunity to learn from his chair on how to be successful at the College" during his regular meetings with Belair. Rogalski also criticized Filozof's failure to be "open-minded" with respect to criticisms of his political conservatism: "[d]uring his debriefing of my class observation when I

suggested that his approach was philosophically conservative in nature, [Filozof] refused to have an open mind and instead told me that I was wrong – he was right."

Based on the foregoing recommendations, Vice President Glocker summarily recommended against renewal, and her recommendation was adopted by the president and the Board. On December 23, 2003, Vice President Glocker advised Filozof that his one-year contract would not be renewed for the following year.

In his Complaint, Filozof alleges that MCC is "politically correct" and shuns conservatives, and that MCC discriminated against, retaliated against and harassed him in violation of Title VII, the NYHRL and the First Amendment, based upon his conservative political beliefs. He also alleges that MCC grants unlawful preferences to women and minorities, and discriminated against him based upon his male gender, and Caucasian race.

He cites four examples of MCC's allegedly discriminatory practices: (1) that he was paid at lower rates than equally qualified African-American professors; (2) that he was subjected to a false sexual harassment charge; (3) that he was unlawfully terminated based upon his conservative political beliefs and in retaliation for expressing those beliefs, including his support for the war in Iraq; and (4) he was denied opportunities for advancement at MCC, including a leadership program for female faculty and a student teaching internship for minority faculty, because of his gender and race.

MCC now moves for summary judgment dismissing the Complaint in its entirety. Plaintiff has moved for declaratory and injunctive relief declaring certain of MCC's diversity initiatives unlawful and preventing their further use. Specifically, plaintiff challenges MCC's sponsorship of

attendees at the "Leaders" faculty development program ("Leaders program"), which provides female faculty members with administrative training and admission to networking events, and the Alice Young Internship Program ("Young Internship"), which offers training and mentorship to minority faculty members.

## DISCUSSION

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, a common component of discrimination actions, *see Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Federal Savings and Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000), *quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993) (trial courts should not "treat discrimination differently from other ultimate questions of fact").

### I. Filozof's First and Fourth Causes of Action

Filozof's initial cause of action for violation of the First Amendment, pled in conjunction with his fourth cause of action under Section 1983, is asserted against all of the defendants.

Defendants urge dismissal of this claim based upon Filozof's alleged failure to state it with adequate specificity or to support it with subsequently-discovered evidence. Specifically, the First Amendment claim in Filozof's Amended Complaint generally relies upon the preceding 165 paragraphs, and does not specifically identify the relevant speech, or the facts demonstrating that he was retaliated against for engaging in that speech. *See Alfaro Motors, Inc. v. Lord*, 814 F. 2d 883, 887 (2d Cir. 1987).

Plaintiff, however, argues that he has sufficiently established a violation of his First Amendment rights. "To survive summary judgment on a section 1983 First Amendment retaliation claim a plaintiff must demonstrate that he engaged in protected speech, and that the speech was a substantial or motivating factor in an adverse decision taken by the defendant." *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006).

Filozof identifies his protected speech as a pattern of political expressions, both in conversations with MCC faculty and administration during the 2002-2003 school year, and by means of a bumper sticker he posted on his office door, which were conservative in nature, and supportive of President Bush's administration in general and the Iraq war in particular. MCC does not deny that Filozof's speech is "protected" within the meaning of the First Amendment, or that it was aware of Filozof's political views. Chairperson Belair, Dean Rogalski and Vice President Glocker all testified that during the course of Filozof's employment, they became aware of his expressed conservative Republican political beliefs. (Dkt. #62-7, Exh. X at 47:17-48:19; Dkt. #62-8, Exh. EE at 56:10-18; Dkt. #62-8, Exh. GG at 57:1-9).

Upon careful consideration of the undisputed facts, I find that there are material questions of fact with respect to whether Filozof's political speech was a substantial or motivating factor in MCC's decision not to renew his faculty contract.

In assessing MCC's proffered reasons for Filozof's non-renewal, the Court is mindful of the well-settled proposition that a "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Ctr.*, 509 U.S. 502 at 511. Here, there is some evidence to suggest that the "facts" identified by MCC as the reason for Filozof's non-renewal may have been misstated or unduly inflated.

While admitting that Filozof "met his obligations as a second year Instructor," Belair grounded her non-renewal recommendation upon Filozof's failure to be a "good citizen," citing his "indifference to departmental and college culture," his "opposition to any type of administrative work such as search committees and assessment activities," and "his feeling that activities such as doing assessment, being a faculty senator, and working with those outside his discipline area hold no meaning or purpose for him." (Dkt. #62-4, Exh. D at 2).

Belair's assessment of these deficiencies is, however, to an appreciable extent, contradicted by the documents that had been previously submitted to her by Filozof's cluster. Those documents attested to Filozof's many non-teaching activities, including his membership on an assessment committee and participation as a faculty senator and faculty senator committee member. (Dkt. #62-1, Exh. A at D00007 et seq.). Belair's recommendation also relies upon a painstakingly constructed time line identifying minor infractions by Filozof, such as an e-mail reference to Janet Glocker as

"JGlo," a reference to "pretty girls" which prompted Belair to tell Filozof he "needed to deconstruct [his] language,"[1] the frequency with which Filozof kept his office door closed during office hours, and his invitation to Belair to go out to lunch. (Dkt. #62-1, Exh. A at D000401; Dkt. #62-4, Exh. D). Upon review of that time line, even Dean Rogalski opined that Belair's criticisms of Filozof were unduly harsh, testifying that Belair had "placed a spotlight" on Filozof by chronicling "every action he has made on campus,"and was "more concerned with documenting Michael's actions and words" than "listening to Michael." (Dkt. #62-4, Exh. E; Dkt. #62-8, Exh. GG at 75:3-77:3, 77:19-20, 16-17). As a result, "Ms. Belair was raising the bar very high for Dr. Filozof in comparison to other junior faculty in her department," such that it would have been a "logical" conclusion for Filozof to conclude that Belair was "out to get him." (Dkt. #62-8, Exh. GG at 78:3-6, 84:12-20). In an undated memorandum concerning the deterioration of the relationship between Belair and Filozof, Rogalski openly worried that "if Michael is not retained, the department will see this along party lines." (Dkt. #62-4, Exh. E).

Belair's involvement in the sexual harassment complaint that was filed against Filozof also raises questions as to her motives. According to Rayner, her sexual harassment complaint against Filozof came about only after she was pressured by Belair to file the complaint, even after Rayner repeatedly protested that she did not believe Filozof had sexually harassed her and did not wish to

---

[1] As plaintiff takes pains to explain, Belair's insistence that Filozof "deconstruct" his language was, itself, suggestive of the gulf between their political and/or philosophical points of view. Deconstruction refers to the critical analysis of language to expose its underlying assumptions. Its use has strong associations with, *inter alia*, feminist, Marxist, and Freudian philosophies. *See e.g.*, M.J. Clark, *Deconstruction, Feminism, and Law: Cornell and MacKinnon on Female Subjectivity and Resistance*, 12 DUKE J. GENDER L. & POLICY 107 (2005); Dana Raigrodski, *Breaking Out of "Custody": A Feminist Voice in Constitutional Criminal Procedure*, 36 AM. CRIM. L. REV. 1301 (1999).

file a complaint against him.[2] Taken as a whole, Belair's assessment of Filozof does not bear a significant relationship to the performance factors identified in the Faculty Contract, and a reasonable jury could find that it is, at least in part, factually off-base.

Similarly, Rogalski characterizes the reason for his decision not to recommend Filozof's retention as Filozof's inability to iron out his ideological and personality differences with Belair, which he attributes to Filozof's lack of "open-mindedness." Specifically, Rogalski focuses on Filozof's belief "that his way of looking at the world, that his conservatism is the correct way and the only correct way." (Dkt. #62-8, Exh. GG at 64:3-6). *See also* Dkt. #62-6, Exh. K at 1-2 ("I also was disappointed when I suggested to Michael that his philosophy was conservative and he remarked that it was not – it was factual and correct" . . . "he does not have an open mind . . . [i]nstead of truly

---

[2] As Rayner testified at her deposition:

> . . . it was an afternoon and it was almost 3 o'clock and my phone rang. It was Susan Belair and she said, "Di[]," we need you to come over and file a complaint on the Filozof matter or issue" or whatever. I said, "wait a minute. What are you talking about?" She said, "Well, I'm over in Administration. And you need to come over and file a" – and I don't know if she said sexual harassment or just harassment or whatever. And I do distinctly remember this. I said, "Wait. Wait. Wait. This is – this is getting a little out of control . . . I need to think about this." I said, "I'm not comfortable doing this." She said, "No. You really do you have to come over and do this," you know. I said, "Well, I think that's my decision whether I want to do that." And I remember her sort of talking to me a little bit more and finally I said, "Okay, I'll walk over." [ . . . ] Susan Belair and there was Susan [Baker], myself, David [Day] . . . I said to [Susan Baker], "I really don't want to do this. And I don't understand why I'm – you know, why it's getting to this point . . . Michael did not sexually – this wasn't sexual harassment." [ . . . ] I was more concerned that this was – this was going out of my control. This was my situation and I felt like everybody was taking control of my situation.

(Dkt. #62-8, Exh. FF at 28:18-29:18, 32:11-16, 35:23-36:2).

listening and having an open mind during the meetings [with Belair], Michael often argued and disagreed wit his chair defending himself as always right" . . . "[h]e refused to have an open mind . . . when I suggested that his approach was philosophically conservative in nature, Michael refused to have an open mind . . . Michael has evidenced through his attitude and relationships that he will always consider himself right and others wrong. One of the hallmarks of a successful college professor is that they have an open mind to differing opinions and people . . .")

MCC thus urges that it was not Filozof's political beliefs, but his insistence that they alone are correct and its potential to stifle opposing views in the classroom and elsewhere, that comprised a legitimate, non-discriminatory reason for declining to renew his contract. In essence, it was the strength of Filozof's convictions, and not their content, that doomed him.

Although MCC repeatedly argues that Rogalski's references to Filozof's closed-minded "conservatism" concerned Filozof's classroom techniques and not his personal politics, it is clear from Rogalski's handwritten notes outlining the written recommendation that his conclusion about Filozof's open-mindedness referred to Filozof's political views. *See* Dkt. #62-6, Exh. J ("Also noticed his opinions were conservative (politically) . . . he was upset that I would suggest that his teaching was conservative politically"); Dkt. #62-8, Exh. GG at 62:21-24, 64:3-6 ("Michael had told me that he felt that his way of looking at the world was truthful; there was no debate, in that feminists and Marxists were wrong . . . when a professor says that his . . . conservatism is the correct way and the only correct way, yes, that troubles me").

That Rogalski's allusions to Filozof's lack of "open-minded[ness]" likely referred to Filozof's personal politics and not his classroom persona is further underscored by the materials

submitted to Belair and Rogalski by Filozof's cluster, which indicate that Filozof was tolerant of divergent student views. In unsolicited letters, Filozof's students praise his lack of "one-sided[ness]," his "professionalism . . . and the most important, neutrality," his presentation of "keys to understanding different ideas and modes of government," and the level of "class participation and . . . heated debates on what students actually feel and believe in" that he fostered. (Dkt. #62-1 at D000066, D000069 D000070). Professors who observed Filozof noted that Filozof reacted to student viewpoints different from his own, "[w]ell . . . both the students and the instructor defend their points of view . . . ", and "[w]ith tolerance, while, at the same time, pointing out the relevance of other interpretations of the material." (Dkt. #62-1 at D00049, D000055). An observation performed by Belair herself on October 6, 2003 is overwhelmingly positive, and notes with respect to Filozof's tolerance for alternative viewpoints that, "[t]he students were respectful of [Filozof] as [he] was of them." (Dkt. #62-1 at D000052).

The closeness in time between Filozof's alleged political speech, and MCC's decision not to renew his contract, is also suggestive of a potential causal relationship between the two. "A plaintiff may establish causation indirectly by showing his speech was closely followed in time by the adverse employment decision." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006). Here, it is undisputed that Filozof's political views first came to the fore during the 2002-2003 school year as the build-up to the Iraq war intensified, stimulating political discussion among MCC faculty and staff. *See* Dkt. #62-8, Exh.. FF at 55:10-19 (Rayner: "I'm a Democrat and Mike was a Republican and we would just go back and forth . . . Just the way people chat, you know, about politics"). These expressions included politically charged conversations, as

well as Filozof's posting of an American flag sticker with a pro-Bush administration slogan on his office door in the fall of 2003. Belair's recommendation that Filozof not be retained was made on November 11, 2003, and Rogalski's followed on November 17, 2003. (Dkt. #62-4, Exh. D; Dkt. #62-6, Exh. K).

Ultimately, whether Belair's written recommendation and efforts to convince an unwilling Rayner to file a sexual harassment complaint against Filozof were part of a scheme to "trump up" reasons for Filozof's non-retention based upon their philosophical and/or political differences, and whether Rogalski's repeated references to Filozof's lack of "open-mindedness" are merely another way of saying that Filozof was being punished because he disagreed with the political philosophies of his supervisors at MCC, are questions of fact which cannot, and should not, be resolved by this Court. In order to meet his initial burden on his First Amendment claim, Filozof need not show that his political speech was the only factor in MCC's determination, but must show that it was a "substantial" or "motivating" factor. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Construing the evidence in Filozof's favor, as I must on this motion, I find that Filozof has met this burden, and that MCC has failed to prove that it would have discontinued Filozof's employment even in the absence of such speech. *See id*. Accordingly, MCC's motion to dismiss Filozof's First Amendment claim must be denied.

## II. Filozof's Second and Seventh Causes of Action

Filozof alleges that MCC also discriminated against him on the basis of his male gender and Caucasian race, in violation of Title VII and the NYHRL.

Filozof's claims of employment discrimination pursuant to Title VII and the NYHRL are subject to the burden-shifting analysis articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, he must establish a *prima facie* case of discrimination by demonstrating: (1) membership in a protected class; (2) satisfactory job performance; and (3) an adverse employment action, occurring under (4) circumstances giving rise to an inference of discrimination. *See Collins v. New York City Transit Authority*, 305 F.3d 113, 118 (2d Cir. 2002). Once plaintiff has established a *prima facie* case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then returns to plaintiff, to supply evidence that the legitimate, nondiscriminatory reason offered by the defendant is a mere pretext for discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508 (1993).

MCC argues that Filozof has failed to show circumstances suggesting discrimination, and that in any event, he has failed to rebut its stated reasons for his termination.

Filozof has produced no evidence of circumstances supporting an inference that gender or race-based discrimination played a part in MCC's non-renewal decision, nor can Filozof rely upon his First Amendment claim's demonstration of speech-related pretext to meet his Title VII burden. With respect to his Title VII claims, Filozof must "rebut with sufficient evidence to permit a reasonable factfinder to conclude that the proffered justifications were pretextual *and that the real reason for the challenged . . . decision was unlawful discrimination*"). *Perry v. Johnson*, 150 Fed. Appx. 22, 24 (2d Cir. 2005)(emphasis added). Here, there is simply no evidence sufficient to permit

a reasonable jury to find that MCC's reasons for Filozof's non-retention, even if pretextual in some way, were a pretext for discrimination *on the basis of his race or gender*.

In support of his contention that MCC generally discriminated against male, Caucasian faculty in favor of female and minority employees, Filozof notes that President Flynn had emphasized the need to increase diversity among faculty and staff, admitting that the extent to which MCC's vice presidents were able to increase diversity among their staff was among the "top ten" factors he considered most important in evaluating their performance. (Dkt. #62-8, Exh. DD at 41-43). Chairperson Belair testified that race was a factor that might be considered in making hiring decisions, and that MCC's hiring committee might perceive a candidate's minority status as a positive. (Dkt. #62-7, Exh. X at 60-61, 73). In describing MCC's efforts at diversity, Filozof emphasizes that MCC was not seeking to correct an existing inequity, since the diversity programs were offered even in departments where women and minorities were not actually in the minority, and despite the fact that the ratio of male and female faculty, as well as the ratio of male and female administrators, was already about equal.

Nonetheless, diversity in higher education has been recognized as a compelling government interest. *See e.g.*, *Parents Involved in Community Sch. v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738, 2753 (2007). The mere fact that MCC offered special professional development opportunities to already-hired female or minority faculty, or even that it considered female or minority statuses to be "pluses" when assessing candidates for hire, does not, by itself, suggest that MCC's determination not to renew Filozof's particular contract was influenced by Filozof's race and/or gender. Indeed, MCC had previously hired Filozof, with no apparent reservations, for both the 2002-2003 and 2003-

2004 school years. "[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to him an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000). *See also Carlton v. Mystic Transp. Inc.*, 202 F.3d 129 (2d Cir. 2000). It is undisputed that both Dean Rogalski and Chairperson Belair – the same persons whose recommendations dictated MCC's decision not to renew Filozof's contract for the 2004-2005 school year – had given Filozof outstanding reviews as an instructor during the 2002-2003 school year, and had recommended his rehire for the 2003-2004 school year. (Dkt. #62-1, #62-2, Exh. A at D000184, D000194-196, D000202, D000203).

Because Filozof has not offered evidence sufficient to demonstrate that MCC's proffered reason for his non-renewal was a pretext for discrimination on the basis of race and/or gender, his discrimination claims must be dismissed.

**III. Plaintiff's Motion for Injunctive Relief**

Filozof also requests that the Leaders Program and the Young Internship be declared unconstitutional, and that MCC be enjoined from its continued sponsorship of such initiatives.

As an initial matter, I conclude that Filozof lacks standing to challenge the programs upon the facts alleged. Although it is well settled that a plaintiff need not suffer an "injury in fact" to assert an Equal Protection Clause claim, because standing is created by "the denial of equal treatment resulting from the imposition of [a] barrier, not the ultimate inability to obtain the benefit . . .," *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003), *quoting Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993), a plaintiff must nonetheless

demonstrate that he was "able and ready" to apply for a disputed program in order to establish standing. *See Gratz*, 539 U.S. 244 at 262.

Here, Filozof has failed to show that he was "able and ready" to seek the networking and leadership opportunities afforded by the Leaders Program, or to undertake a student teaching internship like those offered to Young Internship participants. Filozof does not allege that he ever attempted to attain the benefits of networking, leadership, or other training programs during his employment, or that he would have taken advantage of them had they been offered or available to him. *See Clements v. Fashing*, 457 U.S. 957 (1982) (plaintiff's standing to challenge a program on Equal Protection grounds is not vitiated by plaintiff's failure to attempt participation, if it is alleged that the plaintiff *would have* done so, had he not been barred by the challenged policy).

Furthermore, even if Filozof has standing to attack MCC's diversity programs, it is well settled that diversity in higher education is a compelling government interest, and the Court declines to make the sweeping finding urged by Filozof: that all diversity initiatives are, by definition, unconstitutional. *See e.g.*, *Parents Involved in Community Sch.*, 127 S. Ct. 2738 at 2753. Filozof does not argue, nor does the record suggest, that MCC's *de minimis* sponsorship of female professors to attend the Leadership Program, or its provision of mentoring and complimentary services to minority faculty participating in the Young Internship program, is not narrowly tailored to serve that interest.

**CONCLUSION**

Defendants' motion for summary judgment (Dkt. #50) is granted in part and denied in part. Plaintiff's second, third, fifth, sixth and seventh causes of action are dismissed, with prejudice.[3] Plaintiff's motion for declaratory and injunctive relief (Dkt. #67) is denied.

IT IS SO ORDERED.

DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
October 28, 2008.

[3] Filozof has withdrawn his Third, Fifth and Sixth causes of action, which alleged violations of the Rochester Municipal Code, 42 U.S.C. § 1985, and New York State Labor Law §201-d, respectively. He has also withdrawn claims pursuant to Title VII and the NYHRL of discrimination on the basis of his political conservatism and heterosexual orientation.